**Steven W. ARNOLD, Plaintiff,**

v.

**The COUNTY OF NASSAU, The Sheriff of Nassau County and Corrections Officers John Jaronczyk, Thomas Serroen and Michael Feldon, Defendants.**

No. 93–CV–4800.

United States District Court, E.D. New York.

Feb. 10, 2000.

---

Thomas A. Illmensee, Garden City, NY, for the plaintiff.

Paul F. Millus, New York City, for the defendants.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

The Court must decide whether to let stand a $900,000 jury verdict for the plaintiff, Steven W. Arnold ("Arnold"), against the municipal defendants, The County of Nassau and The Sheriff of Nassau County (collectively "County"), for failing to protect him from being assaulted and severely beaten by fellow inmates while being held as a pre-trial detainee at the Nassau County Correctional Center ("jail") on a rape charge.[1] The jury determined that liability was warranted against the County, but not against any of the individual correction officer defendants, as a matter of federal constitutional significance under the concept of "deliberate indifference," as well as by reason of negligence under New York State law. The Court reserved decision in this bifurcated trial on defendants' motions to dismiss these claims pursuant to Rule 50(a) of the Federal Rules of Civil Procedure ("FRCP" or "Rule") at the close of plaintiff's liability case and, again, at the close of all the evidence during that phase of the trial. It has yet to decide the motions, but the Clerk of the Court, at the conclusion of the damage phase of the trial, inadvertently entered judgment. Defendants thereafter moved pursuant to Rule 50(b), contending that they are entitled to judgment as a matter of law because: (1) on the issue of constitutional municipal liability, there was a failure of proof that the County had adopted policies or practices that were deliberately indifferent to a known substantial risk of harm that pre-trial detainees charged with sex offenses faced from other inmates and, in any event, there was insufficient evidence of a direct causal link between any such policies or practices and Arnold's injuries; and (2) on the issue of negligence, there was insufficient proof that the attack on Arnold was foreseeable and the proximate cause of his injuries. The County has alternatively moved, under Rule 59(a), for a new trial or, further in the alternative, for a conditional remittitur on damages. The motions are denied in their entirety.

## FACTS

### 1. Arnold's Placement in Protective Custody

On July 24, 1992, Arnold was booked by correction officer Thomas Taranto ("Taranto") at the jail. See Trial Transcript ("Tr.") at 523–24. Because Arnold was charged with a sex offense, and feared for his life, Taranto recommended that he be placed in "administrative segregation." Exhibit 3 (Administrative Segregation Report). As stated in this report, Taranto's recommendation was made pursuant to "Warden's Order Sex Crimes." Id. This order had been in effect since 1987, see Tr. at 93, and provided that "inmates admitted to the [c]orrectional [c]enter on a sex-related crime will be placed in protective custody and reviewed within 10 days." Exhibit 4. As explained by Captain Harold Dane ("Captain Dane"), who was in charge of security and booking operations at the jail, the rationale for the warden's order was "the belief on the part of our administration that those people who commit sex crimes are sometimes subject to assault by

---

1. The case has been tried, without objection, on the premise that the County of Nassau would be liable for the official misdeeds of its Sheriff; thus, the Court has equated these two entities. Prior to January 1, 1990, the New York State constitution provided that a "county shall never be made responsible for the acts of the sheriff," N.Y. Const. Art. XIII, § 13, subd. [a]. See Wilson v. Sponable, 81 A.D.2d 1, 10, 439 N.Y.S.2d 549, 555 (4th Dep't 1981). Effective January 1, 1990, the constitution was amended to delete this provision; ac-cordingly, a county may now assume liability on behalf of its sheriff. See Santiamagro v. County of Orange, 226 A.D.2d 359, 359–60, 640 N.Y.S.2d 251, 252–53 (2d Dep't 1996); see also Sagendorf–Teal v. County of Rensselaer, 100 F.3d 270, 276 (2d Cir.1996) (holding that for claims based on violation of federal constitutional rights, 42 U.S.C. § 1983 preempts any New York State constitutional bar against a county's assumption of liability for actions of the sheriff).

other inmates." Tr. at 78. As he elaborated:

> [P]eople who do these kinds of crimes are looked down on and [other prisoners] mete out punishment whenever and if ever they can. For argument's sake, a cop murderer may be considered in high esteem by the inmate population. But this level of crime seems to bring out a much more violent reaction on the part of the general inmate housing population.

Tr. at 804. Consequently, in recognition that "inmates who are charged with sex-related crimes [are] more likely to be the victims of violence on the part of other inmates," the order was issued, as Warden Stenzel testified, "so it [wouldn't] happen." Tr. at 669–70.

In addition to sex crimes detainees, those in need of mental observation were also placed in protective custody. Generally, they were housed in a separate tier, but, as Deputy Undersheriff Weber testified, mental observation inmates could be commingled with sex offense inmates. *See* Tr. at 782. Because Arnold failed a suicide screening test, he was placed by Taranto in a mental observation tier. *See* Tr. at 538. He was never told the type of protection that he would be afforded, since it was not the facility's practice or policy to do so, *see* Tr. at 538–39, but he was given the option to be "locked in his cell 22 hours a day." Exhibit 3. Arnold declined to be so confined. *See id.*

The protective custody tiers were located on the fourth floor of Building B. *See* Tr. at 264. There were four tiers on the floor, each containing twenty cells. *See* Tr. at 61. The cells could house twenty five inmates because five of them were double bunked. *See* Tr. at 95. Each tier was approximately 200 feet long. *See* Tr. at 62–63. The configuration of the tiers is depicted in a diagram reproduced as an Appendix to this decision. A large visual display of this diagram, together with various markings made by witnesses and shown to the jury during the course of the

trial, was received in evidence. *See* Exhibit 1. It was frequently referred to by a number of prison officials during their testimony to explain the physical layout of the tiers and the nature of the security. *See, e.g.*, Tr. at 59–62. As shown in the Appendix reproduction of this Exhibit (without witness markings), each tier was a self-contained unit with its own set of locked doors. Inside each tier, in addition to the cells, was a common area, alphabetically marked "A," "B," "C" and "D", respectively, corresponding to the tiers' designations, where inmates congregated when not locked in their cells. *See* Tr. at 275. The cells were unlocked after breakfast, and remained unlocked until the evening, except during meal periods. *See* Tr. at 94. When unlocked, the cell bars were "rolled back." Tr. at 344. Outside each tier was a "lock box," which served as a "security post." Tr. at 61. A perimeter catwalk encircled all the tiers. *See* Appendix. In addition, there was a lobby entrance to the tier floor, with its own security post. *See id.*; Tr. at 61.

Tiers C and D were mental observation tiers. *See* Tr. at 119. Arnold was placed in Tier C. *See* Tr. at 59. There were then 24 inmates in this tier, including Steven Harget, known to Arnold as "Crazy Steve," Tr. at 464, who had been disciplined three times for "fighting, yelling and disobedience, and fighting again." Tr. at 99. The fights were with "another prisoner." *Id.* The population of the mental observation tiers was not restricted to those charged with sex crimes; rather, all types of inmates were eligible, whether they were awaiting trial or had been convicted, and regardless of the crime charged or committed, unless they were extremely violent or an escape risk. *See* Tr. at 266, 332. As correction officer Brian Kenny ("Kenny") testified, it did not matter whether the inmates were "good or bad." Tr. at 272.

### 2. *The General Supervision*

There always had been a patrol officer who was generally required to walk

around the catwalk perimeter of the four tiers every fifteen minutes. *See* Tr. at 118, 341, 514–15. There is some indication in the record that at times the perimeter patrol may have been completed just once every thirty minutes. *See* Tr. at 203, 233–34. Prior to January 3, 1992, there also was a "tier sitter" for each of the four protective custody tiers. *See* Tr. at 127–28. The function of the tier sitter was to "observe inmates" and "do a constant patrol" of the catwalk perimeter area alongside each tier. Tr. at 514; *see* Tr. at 340–41.

On January 3, 1992, as Captain Dane explained, "[b]ecause of the huge expense that we had incurred running the jail, the Sheriff opted to take the sitting posts and drop them down from one tier per officer to two, two tiers." Tr. at 127. Consequently, there was now only "one [tier sitter] who would cover the two mental observation tiers." Tr. at 120. Captain Dane candidly admitted that the use of just a single tier sitter for two protective custody tiers "detracted, or took away, from a safeguard to prisoners." Tr. at 133. When asked for the rationale for the "old rule," he focused particularly on the mental observation tiers, commenting that "it was important that we watch the inmates that may in fact have problems, mental observation inmates." Tr. at 128.

Using the large diagram, Exhibit 1, Captain Dane showed the jury where the correction officers would normally be subsequent to January 3, 1992: In addition to the one tier sitter per two tiers, and the officer patrolling the entire perimeter, there would be an officer in the lock box, and there could be two officers in the lobby area, one of whom would be stationed in the officer's house. *See* Tr. at 142–43, 156–57. Also using this visual aid, correction officer defendant Michael Feldon ("Feldon") showed the jury that the only way in which a guard could enter the common area was through one of two gates. *See* Tr. at 161–62. Thus, as fellow correction officer Kenny explained, the jail

security was structured in such a fashion that the only physical means for an officer to intervene in an assault would be to go down a corridor, open up two separate locked doors, and then go into the common area. *See* Tr. at 260. He testified that it would only take "[f]ive to seven seconds" to walk the 200 feet "[f]rom one end of the tier to the other." Tr. at 262.

Warden Stenzel, Captain Dane and correction officer Frank Parisi ("Parisi") each testified that "each tier is a separate housing area." Tr. at 520; *see* Tr. at 66, 68, 663–64. Captain Dane, as head of security, while recognizing the need for "active supervision" of all inmates, never knew of any rule or regulation that required, as part of active supervision, the stationing of a guard in a housing area where there were twenty or more prisoners not locked in their individual cells. *See* Tr. at 151–52. No guard was ever posted inside the tiers because it was thought to be too dangerous. *See* Tr. at 345, 359, 816.

### 3. *The Incident*

Arnold testified on direct examination as follows (*see* Tr. at 383–404): After he opted not to be placed in 22 hour lockup when he was being processed on the day of his arrest, he was given a uniform that was "extremely too large." Tr. at 389. He was then taken to a clinic, where some blood was taken, and thereafter escorted to his cell. It was a double bunk cell, and he was placed on the top bunk. After he made his bed, he went out to a table directly across his cell, and had a casual conversation with some inmates.

After speaking with the inmates, he went back into the cell, "talked to the inmate that was there for a while, and went back out on the table." Tr. at 392. He then noticed Feldon at the end of the tier talking to three inmates as Feldon handed them an "article." *Id.* Arnold later surmised that this was a newspaper account of his arrest for rape, *see* Tr. at 442, although no such newspaper article was ever located. *See* Tr. at 446. One inmate

looked like a "bodybuilder," one looked "crazy," and the other was "a small fellow." Tr. at 392. They "were looking at [him]." *Id.* About five minutes later they came up to the table and asked him: "what am I in there for[?]" "what do I do for a living[?]" and "where do I come from?" Tr. at 393. Apparently fearing repercussions if he told them the truth, he said that he "was in for drugs or attempted murder, or something like that." *Id.* He eventually returned to his cell, but about ten minutes later, one of the inmates came to the cell and asked him to go to the end of the tier. He agreed, and was taken to a cell where there were "about five or six inmates." Tr. at 394. There were no guards in the area at that time. Once inside the cell, he was again questioned about "[w]hat [he's] in there for; what do[es he do] for a living; where do[es he] come from." *Id.* One of the inmates "was wagging the article" and said, "I know what you're in here for." *Id.* Another said, "[T]his is an inmate trial." *Id.*

After the inmate trial was concluded, nothing happened, and Arnold returned to his cell. About five or ten minutes later, "they all came to the cell," Tr. at 395, asked him to come out, which he did, and asked him the same questions. As they were debating, "should we or shouldn't we," one of the inmates "plastered [his] head." Tr. at 396. He "saw nothing but stars," but went back into his cell as "they were still punching [him]," and crawled into his bunk. Tr. at 396–97. Still, there were no correction officers in sight. About "a couple of minutes later," these inmates came into his cell, threw him down to the bottom bunk, and were "punching [him] and kicking [him] all over the place." Tr. at 397. He thought he was "going to die," "screamed out for help," and then heard officer Feldon, who he had not seen during either beating, say "[t]hat's enough." Tr. at 398. The beating then stopped.

Approximately "an hour or two hours later," he was brought to the officers' office and asked what had occurred. Tr. at 398. He was afraid to give the inmates' names because he thought there would be "greater problems." Tr. at 399. He was then moved to the next tier, "right next door." *Id.* Soon he heard a lot of commotion at the end of that tier and saw an inmate with a gold tooth talking to people on the other side of the tier. This inmate then came over to him, asked him a question, and hit him "in the head with the back of his hand." Tr. at 400. Under cross examination, Arnold described this occurrence as a "slap" and not a "punch". Tr. at 468. There were no correction officers in the vicinity of that new tier when this third altercation occurred.

"About an hour or two hours, maybe three hours later," he was taken to the jail's medical clinic in a wheelchair. Tr. at 401. He was told by a correction officer to tell the doctor that he "slipped on a bar of soap," otherwise he would have "more problems." Tr. at 401. He did as he was told. Although he was bleeding from his left eye, nose and mouth, he was eventually returned to his new cell. Soon thereafter an inmate alerted an officer that "[t]here's something wrong with him." Tr. at 402. He next remembered being back in a medical clinic in the jail, with IVs in his arms, and then being taken by ambulance to the hospital. "Sometime later," he was returned to the jail, but "[f]our or five days later" he was brought back to the hospital. Tr. at 404–05.

Under cross examination (Tr. 411–95), Arnold testified that the inmate trial took approximately five or ten minutes, *see* Tr. at 448; that the first beating lasted from ten to fifteen seconds, and that the second beating lasted from 45 seconds to a minute. *See* Tr. at 461–63. One of the attackers during the second beating was "Crazy Steve." Tr. at 464.

Defense counsel sought to establish during cross examination the date and times when the assaults occurred. Arnold acknowledged that he was admitted Friday night, July 24th, at approximately 9:18 p.m., the date and time on the jail's admis-

sion record, *see* Exhibit B, p. 1; *see also* Tr. at 414, 433, and that he went to bed that night without incident. *See* Tr. at 438. He believed that the assaults took place on the next day, Saturday, July 25th, *see* Tr. at 442, 447, but he wasn't sure of the date or the times because it was a "traumatic event," and he didn't "know what was going on." Tr. at 465.

The facility's medical records contain a report of injury to Arnold at 1400 (2:00 p.m.) on Sunday, July 26th that resulted in bringing him to the jail's medical unit. *See* Exhibit 11, p. 1. It was prepared and signed by correction officer Kenny, and states: "[Inmate] apparently slipped in his cell injuring his head. [Inmate] is not responsive to any questions." *Id.; see* Tr. at 247. The report also states that no correction personnel witnessed the injury. *See* Exhibit 11, p. 2. Kenny had no recollection of the incident, but opined that Arnold must have been conscious; otherwise medical personnel would have come to his cell. *See* Tr. at 249–50.

The medical portion of this report, prepared by an emergency medical technician, Candice Turner ("Turner"), states, in abbreviated format: "[N]osebleed and contusion to [left] side of forehead. No [loss of consciousness], pressure applied to nose, bleeding controlled; ice applied to head." Exhibit 11, p. 1; *see* Tr. at 731. Turner estimated that since the injury was reported to have occurred at 2:00 p.m., she would have seen Arnold "shortly after." Tr. at 732. She testified that she would not consider someone who had been given an ice pack to have been seriously injured, and that she would not have allowed Arnold to have been returned to his cell if she believed his injuries were severe. *See id.*

A further report of injury was prepared by officer Parisi the next day, Monday, July 27th, reporting what he observed that morning while making his rounds in the D Tier, where Arnold had been relocated. It states in full:

> While performing the 1100 count I came upon B4 [Tier] D05 cell and instructed inmate Arnold, Steven to stand for the [c]ount. After several orders to this inmate to stand, the inmate located in the same cell said, "he can't he is bleeding." With the tier locked in I proceeded to D05, and noticed that inmate Arnold was bleeding from the mouth, and breathing shallow. Inmate Arnold would not respond to me. I instructed Officer Michelsen, Scott # 909 to call medical and notify Sgt. Mott, [m]edical personnel and Sgt. Mott arrived a short time after this incident. *I was informed by the inmates that this incident happened on the previous 8–4 tour, and on C-block.*

Exhibit 13, p. 1 (emphasis added).

Parisi testified that Arnold did not respond to him "because his medical condition was such that he couldn't respond." Tr. at 509. Attached to his report was an Inter–Departmental Memo from Correction Sergeant Edward Mott ("Mott"), dated July 27th, stating, *inter alia,* that Mott responded to the scene, observed medical attendants placing Arnold into a wheelchair, and that Arnold "was taken to the medical unit and then sent to [Nassau County Medical Center] for evaluation and or treatment." Exhibit 13, p. 2.

Introduced into ·evidence was the logbook of the officers who were the combined Tier C and D tier sitters from July 24th through July 27th. *See* Exhibit 7; Tr. at 120. Reading from the July 26th entries, Captain Dane confirmed that four officers were to share the tier sitter duties that day on the 8 a.m. to 4 p.m. shift, as follows: 8–9, Hill; 9–10, Feldon; 10–11, Kenny; 11–noon, Farrington; noon–1, Feldon; 1–2, split between Kenny and Farrington; 2–4, Farrington. *See* Tr. at 122. These four officers were also to handle the 15 minute perimeter patrols. *See* Tr. 158–61.

Questions posed by plaintiff's counsel to Feldon raised the specter that there may have been a shortage of coverage on July 26th because it was a Sunday, which would

have required an officer to escort inmates to church. *See* Tr. at 168–70. Also, when officers went "out to a meal, [they were] not available to do a patrol." Tr. at 170. Plaintiff's counsel placed in evidence records showing that officers were out to meals on July 26th from 12:15 through 2:15. *See* Exhibit 8; Tr. at 170–73. They indicate that there may have been as many as three of the officers out to meals from noon to 1:00, *see* Tr. at 193–200, and that two officers may have been out to meals at about two o'clock, the time of the injury listed on the jail's report. As Feldon testified in this latter respect:

Q. 1340, what does that say?

A. CO Feldon to meals.

Q. Would that be you?

A. Yes.

Q. 1345, what does that say?

A. No patrol officer meals.

Q. And I believe it says CO Farrington?

A. Yes.

Q. So that is a second entry for the hour of 1300 that an officer is out to a meal.

A. Okay.

Tr. at 173.

Since lunch for the inmates was from 11:00 to noon, it did not matter whether there was a shortage of officers during that time because the inmates would then be locked in their cells. *See* Tr. at 230. However, Feldon could not recall if the inmates were also locked in their cells on July 26th for the additional two-hour period of time after noon when two or three of the officers were out to meals, although he testified that "usually they're locked in" at such times. *See* Tr. at 230. Feldon had no recollection of Arnold or his beatings. *See* Tr. at 176, 243.

#### 4. *The Damages*

The Nassau County Medical Center records establish that Arnold was seen in the emergency room when he was brought to the hospital on July 27th. *See* Exhibit 15. X-rays taken on that date disclosed that he sustained fractures in four facial bones: the zygomatic arch, orbital floor, left maxillary sinus and left frontal zygomatic. *See id.;* Tr. at 1158. He was sent back to the jail, apparently on the same day, and was brought back to the hospital a week later for surgery. *See* Tr. at 1171. This entailed repositioning the bones, drilling holes in them, and inserting a special metal plate with several four-millimeter screws to reconnect the bones to each other. *See* Tr. at 1165.

Arnold's medical expert, Dr. Gary Starkman ("Starkman"), a neurologist, testified that as a result of the attack, Arnold's trigeminal nerve was either compressed or severed because of the fracture of the zygomatic bone. *See* Tr. at 1168. He explained that the trigeminal nerve provides sensation to the face, part of the mouth, and the muscles that are responsible for chewing. *See* Tr. at 1166. Upon examining Arnold, Starkman determined that he suffered a loss of sensation on the left side of his face, inner portion of his cheek, lip and gum. *See* Tr. at 1174–75. Arnold testified that he experiences migraine headaches, a constant irritation to the left side of his face, and numbness above and below his left eye, on his left cheek and in the corner of his lip. *See* Tr. at 1120. Starkman opined that this absence of sensation is permanent. *See* Tr. at 1178.

Starkman also testified that Arnold suffers cognitive impairments. *See* Tr. at 1178. As he explained: "Arnold has certain cognitive deficits, certain impairments in his ability to use his language, to comprehend spoken language, written information, follow certain directions while reading these directions, and certain deficits in attention, concentration and memory." Tr. at 1176. He further testified that these cognitive impairments "are causally related to the ... injuries sustained in 1992," Tr. at 1177, and are permanent:

In sum, Starkman explained:

Mr. Arnold sustained two types of deficits. One is the deficit of his mental abilities, and the second type of deficit is absence of sensation in his face, impairment of his ability to chew normally, to perceive the portion of his face, of his mouth.

* * * * * *

Because of his cognitive impairments, it appears that he will not be able to analyze relatively simple situations, information, directions, that he would have either to listen to or to read this information.

And the second type—the second part of his injury, as far as the sensation in the face concerns his ability to chew normally, the fact that he bites his—the left side, the left portion of his mouth often, and the discomfort he has because of the drooling and losing food on that side of the mouth, that would last also for as long as he lives, and that would impair his normal part of his life.

Tr. at 1178.

Consistent with Starkman's medical assessments, Arnold testified that he has "a problem remembering what I have to do . . . a problem keeping sentences together." Tr. at 1123. He further testified that he was an electrician for the Long Island Railroad, which required him to remember a hundred or more railroad substations and to understand the mechanics of electrical rail wiring, and that he would no longer be able to do this work. *See* Tr. at 1121–22.

The County's medical expert, Dr. Joel S. Delfiner, a fellow neurologist, although expressing some moderate assessments as to the permanency of Arnold's injuries, confirmed under cross-examination that, other than the injury to the inside of Arnold's cheek, he "ha[d] no doubt that the injuries, the fracture injuries as well as the nerve-damage injuries to Mr. Arnold's—the left side of Mr. Arnold's face, were caused by the assault referred to in the medical records." Tr. at 1294–95. And as to the cheek, he did not know, "one way or the other." Tr. at 1295.

## DISCUSSION

### 1. Standards

■ The same standard applies to a Rule 50(a) motion for judgment as a matter of law and a Rule 50(b) renewed motion for judgment as a matter of law. *See Raspente v. National R.R. Passenger Corp.*, 111 F.3d 239, 241 n. 3 (2d Cir.1997). A motion under either section may be granted only if "the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [his] favor." *Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998); *see Vermont Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 277 (2d Cir.1996). This means that "there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or . . . the evidence is so overwhelming that reasonable and fair-minded persons could only have reached the opposite result." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53–54 (2d Cir.1993) (citation and quotation mark omitted); *see Galdieri–Ambrosini*, 136 F.3d at 289. "[T]he court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri–Ambrosini*, 136 F.3d at 289 (citations omitted).

■ A Rule 50(b) motion " 'is limited to those grounds that were specifically raised in the prior [Rule 50(a) motion].' " *Id.* at 286 (quoting *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir.1997) (quotation marks omitted)); *see* Fed.R.Civ.P. 50(b); *Holmes v. United States*, 85 F.3d 956, 962 (2d Cir.1996); *Lambert*, 10 F.3d at 53–54. Pursuant to this specificity requirement, the Rule 50(a) motion "must at least identify the specific element that the defendant contends is insufficiently supported." *Gal-*

*dieri–Ambrosini*, 136 F.3d at 286. The purpose of the specificity requirement is "so that the responding party may seek to correct any overlooked deficiencies in the proof." *Id.* (quoting FRCP 50 Advisory Committee Note (1991)).

■ Unlike a motion for judgment as a matter of law, there is no preservation requirement for a motion for a new trial under FRCP 59(a). *See* Fed.R.Civ.P. 59(a). " 'A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.' " *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir.1998) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir.1997) (citation and quotation marks omitted)); *see Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992). "Unlike a [judgment as a matter of law], a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Song*, 957 F.2d at 1047. In considering a motion for a new trial, a trial court " 'is free to weigh the evidence [itself] and need not view it in the light most favorable to the verdict winner.' " *Id.* (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978)).

### 2. Negligence

■ It is well-settled that the State has a duty to provide inmates with "reasonable protection against the foreseeable risk of attacks by other prisoners." *Blake v. State*, 259 A.D.2d 878, 686 N.Y.S.2d 219, 220 (3d Dep't 1999) (collecting cases). This duty naturally extends to all correctional facilities of the State's municipalities and their correction officers. *See, e.g., Caruso v. County of Suffolk*, 234 A.D.2d 495, 495–96, 652 N.Y.S.2d 58, 58 (2d Dep't 1996) (Suffolk County jail); *Kemp v. Waldron*, 115 A.D.2d 869, 869–70, 497 N.Y.S.2d 158, 158–59 (3d Dep't 1985) (Schenectady County jail). Consistent with the duty, liability can be predicated on a lack of "adequate supervision to prevent that

which was reasonably foreseeable." *Colon v. State*, 209 A.D.2d 842, 843, 620 N.Y.S.2d 1015, 1015 (3d Dep't 1994).

In respect to the three correction officers who were sued in their individual capacities, the Court, after instructing the jury that "correction officers have a duty to use reasonable care to protect prisoners from foreseeable risk of harm, including risk of attack by other prisoners," Tr. at 1004, explained the concept of "foreseeability":

> In regard to foreseeability, a person is only responsible for the results of his or her conduct if the risk of injury is reasonably foreseeable. This would mean in considering the conduct of a correction officer that he had or should have had knowledge of an especially dangerous situation confronting the prisoner. The exact occurrence or exact injury does not have to be foreseeable, but injury as a result of negligent conduct must not be merely possible but probable.

Tr. at 1005.

The Court then instructed the jury as to proximate cause, *see* Tr. at 1006, and concluded by telling the jury that "if you find that Arnold has not proven by a preponderance of the evidence that a reasonably prudent correction officer could foresee danger of injury to Arnold, or that the correction officer acted unreasonably in the light of what could be foreseen, or that the conduct of the correction officer was a substantial factor in bringing about Arnold's injuries, then your verdict shall be for the correction officer on the state law negligence claim against the officer." *Id.*

Arnold's theory of negligence against defendants John Jaronczyk and Thomas Serroen was based upon his claim that they provided him with an oversized uniform to identify him as a sex offender. There was ample basis to reject this rather specious claim. Arnold's apparent theory in respect to Feldon was his belief that Feldon had also identified Arnold as a sex

offender by giving his attackers a newspaper article reporting his arrest, and was otherwise lax in his supervision. It was well within the jury's province to exonerate Feldon from personal liability since there was no evidence disclosing the contents of any such newspaper article, and no evidence of the nature of Feldon's supervision other than Arnold's testimony that Feldon was the correction officer who ultimately interceded.

In respect to the issue of the County's negligence, the Court charged the jury in accordance with the Sheriff's nondelegable statutory duty under the State Correction Law. *See Kemp*, 115 A.D.2d at 870, 497 N.Y.S.2d at 159 ("pursuant to Correction Law § 500–c, the Sheriff has a nondelegable duty to keep prisoners in the county jails safe"[2]):

> The Sheriff acting on behalf of Nassau County has the responsibility under New York State Correction Law 500–b to safely keep every person lawfully committed to his custody.... In that regard New York Correction Law 500–b(7) ... requires the sheriff to do the following: [t]o exercise good judgment and discretion and to take reasonable steps to ensure that the assignment of persons to facility housing units; fosters the safety, security and good order of the jail; and affords appropriate precautions for the personal safety and welfare of persons in custody with particular attention to those who are known to be vulnerable to assault or any physical or mental abuse. The sheriff shall consider, among other factors, the following in complying with this law: [a] prisoner's prior history of mental illness and/or prior history of sex offenses. This is what the statute provides as the duty[.]

Arnold claims that Nassau County was negligent in that it failed to provide him proper supervision or protection as required by the statute as a pre-trial detainee charged with a sex crime to safeguard his safety from physical attacks by other prisoners.

In order for Arnold to establish this claim against Nassau County he must prove by a preponderance of the evidence that there was, indeed, a violation of New York Correction Law 500–b(7), and that such violation was a substantial factor in bringing about his injuries. Tr. at 1007–08.

The Court also instructed the jury that it "may, but need not," Tr. at 1008, consider the State's Minimum Standards and Regulations for Management of County Jails, in assessing whether the statute had been violated:

> In determining whether a violation of the statute has occurred, you may consider that New York State has promulgated regulations concerned with Minimum Standards and Regulations for Management of County Jails and Penitentiaries. In that regard, there is a regulation ... 9(F) NYCRR, Part 7003, [which] provides in pertinent part that "active supervision shall be maintained in all facility housing areas, including multiple occupancy housing units when prisoners are confined in such area but not secured in their individual housing units."

Active Supervision is defined under [the] regulations as the following: [t]he immediate availability to prisoners of facility staff responsible for the care and custody of such prisoners which will include (1) uninterrupted ability to communicate orally with and respond to each prisoner unaided by any electronic or other artificial amplifying device, (2) the conducting of supervisory visits at 15–minute intervals, (3) the ability of staff to immediately respond to emergency situations, and (4) in any facility

2. New York Correction Law § 500–c provides that, subject to certain exceptions, "the sheriff of each county shall have custody of the county jail of such county." It further provides that the sheriff "shall receive and safely keep in the county jail of his county each person lawfully committed to his custody...." *Id.*

housing area [in] which more than 20 inmates are housed the continuous occupation of a security post within such housing area.

Should you find that Nassau County has violated these regulations that I just said, you may, but need not, consider the violation as some evidence of negligence. You may, therefore, consider this together with all of the other evidence in this case in determining whether Nassau County has violated its duties under Section 500–b(7) of the New York Correction Law.

Tr. at 1008–09.

Lastly, the Court advised the jury on proximate cause:

If you find a violation of [S]tatute Section 500–b(7), then you must also determine [that] such violation was a substantial factor in bringing about Arnold's injuries.

If you find that Arnold has proven by a preponderance of the evidence that Nassau County has violated New York Correction Law section 500–b(7) and that the violation of such law was a substantial factor in causing Arnold's injuries, then your verdict shall be for Arnold on his state law negligence claim against Nassau County.

Tr. 1009–10.

During the charging conference, the County took issue with the Court's decision to charge that the violation of the statute would constitute negligence. *See* Tr. at 874–76. It contended that "the jury should be instructed on the same elements of negligence vis-a-vis the municipality as the court will instruct them for the individual defendants," Tr. at 876, specifically, that "a duty must be breached with foreseeability." Tr. at 875. The County argued that the jury should only be permitted to consider the violation of the statute, and/or the violation of the regulation, as some evidence of negligence. *See* Tr. at 874–75. The Court rejected this contention, explaining:

The violation of the statute, I think, would establish negligence as a matter of law. The violation of the statute is designed to protect a particular class, here inmates, and I think it is the type of statute that really can be considered to be negligence, *per se,* once it is found to have been violated. And I think that the regulations can be considered as some evidence which the jury can consider … if it chooses to do so, together with all the other evidence, to determine whether the statute has been violated.

Tr. at 875–76.

The County does not directly take issue with the Court's municipal negligence charge in its post-verdict motions, although it certainly could have raised the issue as part of its Rule 59(a) motion. *See Morse/Diesel, Inc. v. Trinity Inds., Inc.,* 875 F.Supp. 165, 169 (Rule 59 motion "may be predicated on a court's error in giving, or refusing to give, instructions to the jury"). It argues only that the plaintiff "did not provide any evidence from which a jury could have determined that the assault on plaintiff was foreseeable as a matter of law or that his injuries were proximately caused by defendants' actions or inactions," [Defendants'] Motion for a New Trial Under Fed.R.Civ.P. 50(b) and/or Fed.R.Civ.P. 59, or, in the Alternative, for Remittitur, p. 1 (unnumbered); or, alternatively, that a new trial should be granted because the jury's verdict was "against the weight of the evidence." *Id.* at 38. Nonetheless, since the Court did not mention the word "foreseeability" in regard to its charge on municipal negligence, the County appears to implicitly challenge the propriety of predicating liability on the violation of Correction Law § 500–b(7).

The issue, properly framed, consequently appears to be whether the Court's charge was correctly formulated, and, if so, whether there is factual support for the jury's liability verdict under the respective FRCP 50(b) and FRCP 59(a) evidentiary standards. If the charge was not correctly

formulated, *sua sponte* consideration would have to be given to granting a new trial under the "manifest injustice" prong of Rule 59(a). *See King v. Deutsche–Dampfs–Ges.,* 397 F.Supp. 618, 622 (S.D.N.Y.1974) (new trial ordered on court's own motion because of improper jury charge, after giving parties notice and opportunity to be heard); *see also Failla v. City of Passaic,* 146 F.3d 149, 156 (3d Cir.1998) (*sua sponte* exercising discretion to review jury instructions and interrogatories as part of court's determination that a new trial was warranted); *Murphy v. City of Long Beach,* 914 F.2d 183, 186–87 (9th Cir.1990) (improper jury charge one of reasons for *sua sponte* grant of new trial). If, however, there is no evidentiary basis to support the correctly formulated law, dismissal would be warranted if the law was correctly postulated by the movant at trial and the appropriate Rule 50(a) motion was made. *See Morse/Diesel,* 875 F.Supp. at 172 (applying "plain error" analysis to determine whether to excuse party's failure to timely object to jury instruction); *Doctor's Assocs., Inc. v. Weible,* 92 F.3d 108, 113–15 (2d Cir.1996) (applying exception to specificity requirement to avoid "manifest injustice," and dismissing case under correctly formulated law).[3]

■ The province of statutory liability in the field of negligence was nicely laid out by New York State Court of Appeals Chief Judge Breitel when writing for the Appellate Division in *Daggett v. Keshner,* 284 A.D. 733, 134 N.Y.S.2d 524 (N.Y.A.D. 1954). In prescinding between statutory violations constituting some evidence of negligence, negligence *per se,* and strict liability, he explained:

> Where a statute defines an act as wrongful, it has been said that if the enactment were intended to benefit the

public at large, or only a limited class of which the injured person is not a member, its violation would not constitute, ipso facto, negligence. In that case, the violation of the statute, however, if otherwise relevant, is evidence of negligence which the jury may consider in conjunction with all other proven facts. [Citations omitted.] A proximate causal connection between the wrongful act and the accident must nevertheless exist in order for liability to be imposed. [Citations omitted.]

> Where, however, the statutory duty of care was imposed for the sole benefit of a class of persons, regardless of the size of the class, of which the plaintiff is a member, the breach of the statutory duty generally constitutes conclusive evidence of negligence. It is then, also, frequently referred to as negligence *per se,* or negligence as a matter of law. [Citations omitted.] Even in such case, where liability to the plaintiff is impliedly created by the statute, before redress may be obtained, it has been held that the act, wrongful only by statute, must be the proximate (in the sense of reasonably foreseeable) cause of the accident. [Citations omitted.]

> The situation may be somewhat different, when ... the statute does more than merely make certain conduct wrongful but imposes, in so many words—and without limitation, civil liability in favor of anyone injured as the result of the violation of the statute. Then, it is even clearer, that the question is no longer whether there is evidence of negligence. The wrongful character of the act with respect to the plaintiff is expressly fixed by the statute, whether we call it negligence *per se,* negligence as a matter of law, or abso-

---

**3.** While there is no doubt that the County complied with the strictures of FRCP 51 by requesting that the Court give the same charge on the municipal negligence claim as it did on the negligence claims against the individual officers, including the charge on "foreseeability," the record does not contain a specific request for dismissal under FRCP 50(a) for failure of proof of "foreseeability." However, in the context of the record as a whole, the Court will consider the requisite Rule 50(a) specificity requirement to have been satisfied.

lute liability not based on negligence. [Citation omitted.] The remaining question is only whether there is a sufficient connection between the violation and the ensuing accident and injuries. This may not require the same degree of proximate causal connection which we are accustomed to require in the field of negligence. [Citation omitted.]

284 A.D. at 735–36, 143 N.Y.S.2d at 527–28.

Section 500–b(7) of the New York Correction Law by its very terms requires the Sheriff, in behalf of the County, "to take reasonable steps" to ensure that the assignment of housing unit personnel will afford "appropriate precautions for the personal safety and welfare of persons in custody," and requires that "particular attention" be paid "to those who are known to be vulnerable to assault or any physical or mental abuse." In that latter regard, the Sheriff is required to consider, among other factors, "[a] prisoner's prior history of mental illness and/or prior history of sex offenses." *Id.*

■ Since the statute is designed to protect a class of persons that includes the plaintiff against the type of harm that actually occurred, its violation would constitute negligence *per se.* *See Daggett, supra; see also Pratico v. Portland Terminal Co.,* 783 F.2d 255, 262 (1st Cir.1985) ("[N]egligence *per se* will be found where violation of a statutory duty caused precisely the kind of harm which the statute was designed to prevent."); Dan B. Dobbs, *The Law of Torts* § 137 (2000) ("Class of Risk and Class of Person Covered by the Statute"). As such, there was no warrant to separately charge the jury in respect to foreseeability of harm since the statute embraces that aspect of liability. By contrast, in the absence of a negligence *per se* statute, a cause of action predicated on principles of general negligence under New York law will invariably require the judge to "determine[ ] duty by the foreseeability of the plaintiff and policy considerations, while foreseeability of the harm

that transpired is for the jury." *Burke v. Warren County Sheriff's Dep't,* 916 F.Supp. 181, 186 n. 4 (N.D.N.Y.1996); *see in general Palka v. Servicemaster Mgm't Servs. Corp.,* 83 N.Y.2d 579, 584–87, 611 N.Y.S.2d 817, 820–21, 634 N.E.2d 189 (1994). Consequently, the Court charged the jury on foreseeability on the general negligence claims against the individual correction officers, and charged the statute that the legislature enacted in respect to the County's responsibility to protect against the type of harm suffered by the plaintiff.

■ There is ample evidence in the record to support the jury's negligence determination against the County, especially since the jury was entitled to take into account the State's Minimum Standards and Regulations for Management of County Jails and Penitentiaries. *See* 9F NYCRR, Part 7003; *see also Rizzuto v. L.A. Wenger Contracting Co., Inc.,* 91 N.Y.2d 343, 349, 670 N.Y.S.2d 816, 818–19, 693 N.E.2d 1068 (1998) (violation of administrative regulation is "simply some evidence of negligence which the jury could take into consideration with all the other evidence bearing on that subject" (citation omitted)); *Vega v. Molina,* 240 A.D.2d 399, 400, 658 N.Y.S.2d 387, 388 (2d Dep't 1997) (same) (collecting cases); *see also Schmidt v. Merchants Despatch Trans. Co. v. United States Gypsum Co.,* 270 N.Y. 287, 306, 200 N.E. 824 (1936) ("In the performance of [statutory] duty ... [t]here are perhaps some gaps to be filled in by administrative regulations."); *Caruso,* 234 A.D.2d at 496, 652 N.Y.S.2d at 59 (whether "active supervision" was maintained in housing facility area as provided for under 9 NYCRR 7003 raised issue of fact precluding summary judgment).

Certainly, there is no question but that the correctional facility properly recognized that plaintiff, as a pre-trial sex crime detainee, was deserving of special care to guard against a foreseeable risk of inmate attack. The jury could properly take into

account that by being placed in a mental observation tier the plaintiff would be exposed to an even greater risk of harm, given the unpredictable nature of this aspect of the prison population, and that, consequently, appropriate supervision should not be compromised. In this latter regard, the jury was entitled to conclude that such compromise did occur when the facility retreated from its previous standard of providing a tier sitter for each protective custody tier, including the mental observation tiers, to a single tier sitter to cover two tiers. Certainly, it was entitled to credit Captain Dane's testimony that this new policy, adopted just seven months before plaintiff's admission, "detracted, or took away, from a safeguard to prisoners." Tr. at 133. The jury was also entitled to reject the facility's proffered cost-saving motivation for reducing security. Although budgetary constraints imposed by executive and legislative branches of a local government due to limited community resources may be appropriate factors to consider, under proper circumstances, in the staffing of a municipality's institutions, see *Young v. State,* 40 A.D.2d 730, 732, 336 N.Y.S.2d 470, 473 (3d Dep't 1972); *Riss v. City of New York,* 22 N.Y.2d 579, 581–82, 293 N.Y.S.2d 897, 240 N.E.2d 860 (1968), the County presented no evidence that its budgetary concerns were such that it had no plausible alternative but to jeopardize the safety of its most vulnerable prisoners—a dubious proposition in any event.

In addition to the change in the tier sitter policy, the jury had before it a host of additional factors bearing upon the breach of the facility's statutory duty to provide appropriate supervision. As the fact finder, it was entitled to credit that portion of the plaintiff's testimony that there were no correction officers observing the inmate trial or the beatings, even though they entailed numerous prisoners and lasted for a sustained period of time; and that supervision was particularly lacking during the probable time of the trial and assaults because two or three of the four officers who were to patrol the tiers were then out to meals and the prisoners were not locked in their cells. Moreover, the jury could properly determine that the jail did not provide active supervision under the minimum standards set forth in the regulations for the general management of county jails, let alone for the management of its protective custody tiers. Under these regulations, there was sufficient evidence to allow the jury to conclude that on the day in question there was no uninterrupted ability to communicate orally, that supervisory visits may not have occurred at fifteen minute intervals, and that the staff did not have the ability to immediately respond to emergency situations. The jury could also have properly considered, based upon the testimony of Warden Stenzel, Captain Dane and officer Parisi, whether each tier was a separate housing area, and whether there was "continuous occupation of a security post within [the] housing area," which the County acknowledged at trial were questions of fact "to be left to the jury." Tr. at 913.

That the plaintiff chose not to be confined to 22 hour lock-in does not undermine the jury's negligence determination. This option was accorded to Arnold as a consequence of successful constitutional litigation challenging the right of the County's prison officials to mandate this type of restriction for its pre-trial detainees without regard for the individual situation of each detainee. See *People ex rel. Schipski v. Flood (Flood I),* 88 A.D.2d 197, 452 N.Y.S.2d 652 (2d Dep't 1982); *People ex rel. Schipski v. Flood (Flood II),* Index Nos. 23381/80, 1236/80, 3496/80, 51536, slip op. (Sup.Ct., Nassau County, Sept. 20, 1984). In choosing not to be locked in his cell for virtually the entire day and night, Arnold could plausibly expect that the jail would nonetheless take reasonable measures to protect him.

■ Since there was sufficient evidence to support the jury's negligence determination, it remains to be determined

whether there was also sufficient evidence to support its finding of proximate cause. The Court recognizes that correction officials cannot be insurers of a prisoner's safety, and that some occurrences cannot reasonably be avoided. *See, e.g., Flaherty v. State,* 296 N.Y. 342, 346, 73 N.E.2d 543 (1947) (unanticipated acid attack over sleeping claimant); *Auger v. State,* 263 A.D.2d 929, 693 N.Y.S.2d 343, 345 (3d Dep't 1999) (State did not fail to exercise reasonable care when prisoner was injured in an unexpected fight with inmate who was not a known dangerous prisoner); *Schittino v. State,* 262 A.D.2d 824, 692 N.Y.S.2d 760, 762–63 (N.Y.A.D.1999) (State had no duty to intervene to protect inmate from another inmate's sudden assault with hot coffee); *Moore v. City of Troy,* 179 A.D.2d 842, 843, 577 N.Y.S.2d 969, 971 (3d Dep't 1992) (suicide). Here, however, the jury could properly conclude that the assaults and surrounding circumstances were of sufficient duration to allow for more timely supervisory intervention, and that there was sufficient opportunity and inclination for the assailants to carry out the attacks because of the lack of supervision.

In assessing proximate cause, the Court is aided by Judge Calabresi's teachings in recently writing for the Second Circuit in *Zuchowicz v. United States,* 140 F.3d 381 (2d Cir.1998). Acknowledging the strictures of past precedents requiring a plaintiff to produce direct evidence connecting the defendant's wrongdoing to the harm, Judge Calabresi noted the change heralded by the writings of Chief Judge Cardozo in New York and Chief Justice Traynor in California. As he explains:

> In various opinions, they stated that: if (a) a negligent act was deemed wrongful because that act increased the chances that a particular type of accident would occur, and (b) a mishap of that very sort did happen, this was enough to support a finding by the trier of fact that the negligent behavior caused the harm. Where such a strong causal link exists, it is up to the negligent party to bring in evidence denying but for cause and suggesting that in the actual case the wrongful conduct had not been a substantial factor.

140 F.3d at 390–91.

As Judge Calabresi further notes, "[t]he general acceptance of this view is both signaled and explained by Prosser," *id.* at 391, as follows:

> And whether the defendant's negligence consists of the violation of some statutory safety regulation, or the breach of a plain common law duty of care, the court can scarcely overlook the fact that the injury which has in fact occurred is precisely the sort of thing that proper care on the part of the defendant would be intended to prevent, and accordingly allow a certain liberality to the jury in drawing its conclusion.

*Id.* (quoting Prosser and Keeton on the Law of Torts § 41, at 270).

Consequently, as Judge Posner has observed: "The general tendency of courts in tort cases, once negligence is established, is to resolve doubts about causation, within reason, in plaintiff's favor." *Kwasny v. United States,* 823 F.2d 194, 196 (7th Cir. 1987). New York State cases place the State among those jurisdictions that afford "a certain degree of liberality" in the realm of jury proximate cause determinations. A good example is *Nallan v. Helmsley–Spear, Inc.,* 50 N.Y.2d 507, 429 N.Y.S.2d 606, 407 N.E.2d 451 (1980), where one of the principal issues was whether the absence of an attendant in the lobby of a hotel, who had no special expertise in building security, could be a proximate cause of plaintiff being shot in the back by a putative assassin. Although there was expert testimony that even an unarmed attendant would have had the effect of deterring criminal activity in the building's lobby, including the attempted assassination attack, there was no way of knowing whether and to what degree the presence of the attendant would have deterred the would-be assassin. Nonethe-

less, the Court of Appeals held that the jury "might well have inferred from the available evidence that the absence of an attendant at the lobby at the moment plaintiff [ ] arrived was a 'proximate' cause of [his] injury." 50 N.Y.2d at 521, 429 N.Y.S.2d at 614, 407 N.E.2d 451.

Under the facts of the present case, the jury's proximate cause determination was in keeping with the present tenor of the law. Furthermore, its determination in that respect, as well as its underlying negligence determination, was not against the weight of the evidence to warrant a new trial under FRCP 59(a). The Court is mindful that many of the essential facts that Arnold testified about in regard to the duration, circumstances and extent of the beatings were largely uncorroborated. Given the nature of this case, it is not at all surprising that there might be a dearth of witnesses who would likely come forward in support of Arnold's testimony. In any event, if the jury's fact finding role is to be vouchsafed, as it must, it was entitled to assess Arnold's credibility and credit the relevant uncorroborated testimony. *See Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 874 (2d Cir.1992) (jury was entitled to believe plaintiff's uncorroborated testimony and find for plaintiff). The Court is also mindful that Arnold's testimony as to the date and times of the assaults was confusing, and did not square with the jail's records and reports. However, the jury could view Arnold's confusion in those regards as manifestations of the cognitive injuries wrought by the attacks. In that regard, the jury and the Court were in the unique position of observing Arnold's halting and obviously impaired speech during his lengthy testimony, something which does not surface from a review of the cold record.

4. Although the County objected to recharging the jury, *see* Tr. at 1342, it has chosen not to renew its objection. Under the circumstances of this case, it was appropriate to recharge the jury, especially since plaintiff acquiesced.

### 3. Deliberate Indifference

In respect to plaintiff's deliberate indifference claims against the individual correction officers, predicated on the constitutional duty of prison officials "to protect prisoners from violence at the hands of other prisoners," *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotation marks and citation omitted), the Court charged the jury, in accordance with the dictates of *Farmer,* that it had to determine, in considering the constitutional liability of each correction officer, whether (1) Arnold was incarcerated under conditions "posing a substantial risk of serious harm," (2) the correction officer "knew that Arnold faced such risk," and (3) the correction officer "disregarded that risk by failing to take reasonable measures to abate it." Tr. at 1000. The Court instructed the jury that "deliberate indifference is more than mere negligence," and explained that the requisite knowledge had to be "actual knowledge," meaning that "the official was both aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists and that he also did, indeed, draw that inference." *Id.* Having found that the officers were not negligent, the jury properly rejected plaintiff's constitutional claims against them.

In respect to plaintiff's constitutional claim against the County, predicated on *Monell* liability, *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the jury initially found for the plaintiff. However, the Court was not satisfied that it had sufficiently explained the concept of "deliberate indifference," and decided, therefore, to recharge the jury in regard to this claim during the damage phase of the trial, after which the jury once again held the County liable. Its charge in that respect was, in pertinent part, as follows: [4]

*See* Tr. at 1341. *See Bonner v. Guccione,* 178 F.3d 581, 586 (2d Cir.1999). Furthermore, the Court cautioned the jury that it was "not to be influenced by [its] initial decision," and was "to evaluate the evidence in light of the

Now, a municipality such as the County, in this case, can, by reason of its policies or practices, be "deliberately indifferent" to a substantial risk of serious harm to prison inmates at the hands of other inmates, and if there's a direct causal link between such deliberate indifference and the injuries suffered by a particular inmate, the municipality is accountable in damages for such injuries. I told you that the plaintiff in this case contends that the Nassau County correctional facility, acting [o]n behalf of the County, had a policy or practice of not providing proper supervision for, and/or protection of, pretrial detainees charged with sex crimes. You are to determine whether the plaintiff has established, by a preponderance of the evidence, each of the following:

1. That he was imprisoned under conditions posing a substantial risk of serious harm to him from other inmates;

2. That the County policymakers responsible for assuring the plaintiff's safety knew or should have known that pretrial detainees charged with sex offenses faced a substantial risk of serious harm under the particular circumstances;

3. That by reason of its policies or practices, those policymaking officials failed to take reasonable measures to abate or minimize the risk.

In that regard, in order to find an inadequate policy or practice in this case, you must find either:

1. The existence of a formal policy, which was officially endorsed by the County correctional facilities' policymaking officials; or

2. A practice so persistent and widespread that it constituted a custom or usage.

Tr. at 1369–70.

The Court reminded the jury that, as explained in the initial charge, if it determined that the County violated the plaintiff's constitutional rights, it also had to determine whether "there was a direct causal link between the violation of the plaintiff's constitutional rights and the injuries which he suffered." Tr. at 1371. In that regard, the Court took pains to elaborate on the concept of "direct causal link" in response to a prescient jury note during its initial deliberations asking the Court to explain the legal definitions of "causal link" and "substantial factor." Tr. at 1075. First, the Court acknowledged that "in regard to the state negligence claim we use[d] the phrase a 'substantial factor,' "[5] but "[w]hen we spoke about the causation element in the context of the federal claim regarding the county's federal liability we use[d] the phrase 'direct causal link,' and you picked up on the fact that there are two different phrases that seem to be part of the same family...." Tr. at 1079–80. Drawing from *Board of County Commissioners of Bryan County v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Court then explained, *inter alia,* that compared to individual liability, causation in respect to municipal constitutional liability "is a little more remote, a little more difficult to connect up"; that the Supreme Court talks about constitutional causation "in terms of the moving force"; that municipal constitutional liability attaches "only when execution of a government's policy or custom ... inflicts the injury"; that "[s]ome of the cases speak in terms of the fact that there must be a plausible nexus or affirmative link between the municipalit[y's] custom or policy and the deprivation of the plaintiff's constitutional rights"; and that the nexus "can't be too tenuous"; it must be "of a substantial

new charge and ... make a fresh determination on the issue of the County's federal constitutional liability." Tr. at 1371.

**5.** The Court also used the phrase "substantial factor," rather than "causal link," in charging the jury on the issue of the correction officers' individual liability under *Farmer.*

304

nature."[6] Tr. at 1082–85.

In response to jury notes during its deliberations after it had been recharged, the Court repeated its "deliberate indifference" instruction, and further explained that "policymakers" are "people like the sheriff and those people who are in charge of making policy for the correctional facility," Tr. at 1446; that a "widespread practice" is not "just a one-shot type of situation," *id.*, and that " 'deliberate indifference' means something other than negligence." Tr. at 1448. In that last regard, the Court admonished the jury that it should not be confused "that just because you found negligence on the part of the County, that that automatically translates to deliberate indifference," Tr. at 1448, and "that you're not to determine whether there was simply negligence here." Tr. at 1488.

■ Before assessing whether there is a sufficient factual basis to support the jury's constitutional liability determination against the County, there are a few conceptual observations that warrant comment. Preliminarily, the constitutional right of a prisoner to be protected from inmate violence has invariably been, as in *Farmer*, subject to scrutiny under the Eighth Amendment. *See Farmer*, 511 U.S. at 832–33, 114 S.Ct. 1970 (collecting cases). However, "the Eighth Amendment's protection does not apply 'until after conviction and sentence.' " *United States v. Walsh*, 194 F.3d 37, 37 (2d Cir. 1999) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n. 6, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Accordingly, as acknowledged by the Second Circuit in *Walsh*, relying on *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), a pre-trial detainee's constitutional

rights must conceptually be evaluated under the Due Process Clause of the Fourteenth Amendment. *See Walsh*, 194 F.3d at 48. In *Walsh*, the court held that the Eighth Amendment analysis applicable to an excessive force claim by a convicted prisoner, as articulated by the Supreme Court in *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995 (1992), would be "applicable to excessive force claims brought under the Fourteenth Amendment as well." *Walsh*, 194 F.3d at 48. Although the precise issue apparently has not yet arisen, *Walsh* supports the Court's supposition, drawing on *Hudson*, that there is no conceptual reason not to analyze a pretrial detainee's Fourteenth Amendment claim under the Eighth Amendment standard governing the right of a convicted prisoner to be free from violence from other prisoners.

■ Next, the Court's research has failed to disclose any case where *Monell* liability has been implicated under the Eighth Amendment, let alone the Fourteenth Amendment, for inmate assaults caused by lack of adequate supervision. Nonetheless, the concept of constructive knowledge by the municipality's policymakers of the risk of harm, rather than the actual knowledge required under *Farmer* for individual prison guard liability, should apply. Indeed, in *Farmer*, the Supreme Court specifically contrasted the subjective knowledge component of individual liability with its understanding of deliberate indifference in *Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), permitting municipal liability in failure to train cases "to be premised on obviousness or constructive notice." *Farmer*, 511 U.S. at 841, 114 S.Ct. 1970. In language equally apropos

---

**6.** The language employed by the courts as to the requisite causation has hardly been a paragon of consistency. *See, e.g., Board of County Commissioners of Bryan County*, 520 U.S. at 404–05, 117 S.Ct. 1382 ("moving force" and "direct causal link"); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) ("affirmative

link"); *Carter v. Morris*, 164 F.3d 215, 219 (4th Cir.1999) ("affirmative link"); *Jones v. Wellham*, 104 F.3d 620, 625 (4th Cir.1997) ("close causal connection"); *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir.1990) ("as long as the causal link is not too tenuous"); *Estate of Bailey v. County of York*, 768 F.2d 503, 507 (3d Cir.1985) ("plausible nexus").

to an inadequate supervision case, it explained that "considerable difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official." *Id;* see *Board of County Commissioners of Bryan County,* 520 U.S. at 407, 117 S.Ct. 1382 ("a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences" (citation omitted)); *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir.1998) ("The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.").

Finally, it is worth noting that the failure of a municipality to provide adequate supervision will invariably, as in the present case, only implicate municipal liability. Thus, the County could logically be found liable under § 1983 in the absence of individual liability. *See Barrett v. Orange County Human Rights Comm'n,* 194 F.3d 341, 350 (2d Cir.1999) (quoting both *Anderson v. City of Atlanta,* 778 F.2d 678, 686 (11th Cir.1985)) ("*Monell* . . . and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government"), and *Garcia v. Salt Lake County,* 768 F.2d 303, 310 (10th Cir.1985) ("*Monell* does not require that a jury find an individual defendant liable before it can find a local governmental body liable"; thus, error in wrongful termination case based on violation of First Amendment for district court to prevent jury from deciding issue of municipal liability simply because individual defendants not found liable).

In sum, in a lack of prison supervision case against a municipality, a jury can assess whether the municipality's policy-makers responsible for attending to prisoner safety knew or should have known that sex offense prisoners or detainees faced a substantial risk of serious harm, even where individual liability is not implicated, and whether the supervisory policies and practices adopted by these policymakers were deliberately indifferent to the safety of these vulnerable inmates.

■ Here, the jury certainly could have determined that the warden, in establishing the policy that inmates charged with sex-related crimes must, upon admission, be placed in protective custody, recognized that such inmates were at risk of serious physical harm from inmates in the general prison population. The jury could also have determined that housing such prisoners in a mental observation tier, which would require them to commingle only with mentally labile inmates, such as the likes of "Crazy Steve," would arguably make them even more vulnerable to inmate attack and, in any event, would warrant heightened supervision. Whether the jail's prior policy of providing just one tier sitter per mental observation tier constituted adequate protection for inmates charged with sex-related crimes who were required to be placed in such tiers, could arguably be the subject of debate. Regardless, viewing the retreat from this standard of supervision to the new policy of one tier sitter per two tiers through the prism of deliberate indifference, and not simply negligence, the jury was warranted in finding the County liable.

The Court's charge appropriately guided the jury in its assessment of deliberate indifference, cautioning that it could not make such a determination based upon the County's negligence. Furthermore, the Court painstakingly explained to the jury the nature of the requisite causal linkage between deliberate indifference and injury. It cannot be assumed that the jury failed to follow the Court's instructions. Disregarding any aspect of negligence, such as the possible failure of the guards to lock the prisoners in their cells at or about the

time of the attack, when two or three of the guards were out to meals, the jury could plausibly conclude that there would always be periods of time when each of the mental observation tiers would be completely unguarded as a consequence of the new tier sitter policy. This conclusion would flow from the fact that perimeter patrols around all the four protective custody tiers only occurred, at best, once every fifteen minutes, and that the relative locations of the two mental observation tiers would not allow for the one sitter to observe both tiers at the same time. Moreover, from the length of the tiers, each two-thirds the size of a football field, as well as their relative locations, and the sustained duration of the beatings, the jury was entitled to assess the likely period of time when the inmates were unsupervised as a result of the single tier sitter policy, and to conclude that a policy which required a jail's most vulnerable prisoners to be left totally unattended for such a period of time equated with deliberate indifference. Furthermore, there was ample evidence of a practice of disregard for the Minimum Standards and Regulations for Management of County Jails that the jury could add to the deliberate indifference mix.

Guided by Captain Dane's acknowledgment that the new tier sitter policy compromised prisoner safety, it was also within the jury's province to conclude that the fractured supervision resulting from the jail's practices and single tier sitter policy provided a permissive climate for intransigence by the jail's mentally disturbed prisoners. Given such an environment, the jury was entitled to determine that the plaintiff would not have been subject to sustained beatings by a group of such inmates if the prison had not adopted a policy and engaged in practices that were deliberately indifferent to the plaintiff's safety, and that such policy and practices

consequently constituted the requisite causal link to his injuries. Accordingly, the jury's constitutional determination that the County should be liable for plaintiff's injuries should perdure.[7]

### 4. Damages

 The jury's $900,000.00 award consisted of $475,000.00 for past damages and $425,000.00 for future damages. Although only one collective past and future damage award could plausibly be fashioned, the Court is mindful that there may be discrete "excessiveness" standards applicable to the state and federal claims. *See Mason v. City of New York,* 949 F.Supp. 1068, 1075 (S.D.N.Y.1996) (analyzing excessiveness under both federal and state law where jury awarded lump sum damages on federal and state claims). Under federal law, a district court determines whether a damage award is excessive by evaluating whether the award "is so high as to shock the judicial conscience and constitute a denial of justice." *Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 165 (2d Cir.1998) (citing *O'Neill v. Krzeminski,* 839 F.2d 9, 13 (2d Cir.1988)) (quotation mark and citation omitted); *see Scala v. Moore McCormack Lines, Inc.,* 985 F.2d 680, 683 (2d Cir.1993). Under New York law, a court analyzes whether the award " 'deviates materially from what would be reasonable compensation.' " *Gasperini,* 518 U.S. at 422, 116 S.Ct. 2211 (quoting New York Civil Practice Law & Rules ("CPLR") § 5501(c)). The "deviates materially" standard "calls for a more circumspect analysis than the 'shock the conscience' standard." *Gasperini,* 518 U.S. at 423–25, 116 S.Ct. 2211. Both standards require the Court to search for and compare awards in similar cases. *See id.; Ismail v. Cohen,* 899 F.2d 183, 186 (2d Cir.1990). The Court concludes that under either standard the damage awards were not excessive.[8]

---

7. In reaching this conclusion, the Court has implicitly determined that there is no warrant

for a new trial on the municipal constitutional liability issue.

8. It is unclear what standard a district court

■ Given the nature of Arnold's cognitive and physical impairments, and Dr. Starkman's assessment of their permanency, the jury's compensatory damage awards do not shock the Court's conscience; nor do they materially deviate from reasonable compensation. These conclusions are in keeping with awards fashioned under the stricter State standard in comparable cases, with due consideration being given to the relative degrees of severity of the injuries in such cases compared to Arnold's injuries. *See Kutch v. Crown Cork & Seal Co., Inc.,* No. 8142/84 (Sup.Ct., N.Y.County, Jan. 16, 1990) (upholding $2,000,000.00 award for extensive mid-face crush injury, crushed zygomatic arch, destruction of the floor of the orbit, fractured left zygomatic-maxillary complex, fractured left frontal sinus, partial left facial paralysis, and dropped eye with diminished vision); *Costello–Hicks v. New York City Health & Hospital Corp.,* 1991 WL 452870 (Sup.Ct., N.Y.County, Oct. 26, 1991) (upholding $1,500,000.00 verdict for multiple traumatic injuries to the head, brain, face and right eye, including multiple crushing fractures involving the facial bones and skull with exposure of the brain, causing chronic headaches and permanent disfigurement of head and face); *Zielke v. City of New York,* No. 1165/87 (Sup.Ct., N.Y.County, Mar. 25, 1991) (upholding $750,000.00 award for multiple fractures of the facial bones, including fracture of the frontal bones, frontal sinus, left orbital bone, left maxillary bone and left zygoma, requiring extensive facial surgery); *Greenberg v. RPM, Inc.,* No. 40250/91 (Sup.Ct., Kings County, Sept. 30, 1996) (upholding $2,750,-000.00 award for extensive skull fractures where plaintiff suffered moderate cognitive impairment, including impaired memory, problem solving functions, attention and concentration, total loss of hearing in left ear and partial loss of bladder control); *Jackson v. Northside Fuel Oil Corp.,* No. 23761/86 (Sup.Ct., Queens County, Apr. 1990) (upholding $6,025,000.00 award for multiple facial fractures where plaintiff suffered brain damage with personality dysfunction, and required full-time institutional care).

■ However, the future damage component of the jury's award must be adjusted pursuant to CPLR § 5041, which requires that for future damages in excess of $250,000, the judgment must provide "for the amount of the present value of an annuity contract that will provide for the payment [of such damages] in periodic installments." *See* CPLR § 5041(e). Recognizing during the trial that State and federal law call for different rules for discounting future damages, *see Oliveri v. Delta Steamship Lines, Inc.,* 849 F.2d 742, 750 (2d Cir.1988); *Reliant Airlines, Inc. v. County of Broome,* 90–CV–537, 1995 WL 574460, at *3 (N.D.N.Y. Sept.29, 1995); *Flores v. Union Pacific R.R. Co.,* 92–CV–6378, 1994 WL 704832, at *1 (S.D.N.Y. Dec.16, 1994), the Court proposed, and the parties agreed, that State law would apply. *See* Tr. at 1364–65.

On a concluding note, the Court is aware, although the jury, appropriately, was not, that Arnold was eventually con-

should apply in determining excessiveness where, as in this case, the jury's award encompasses damages for a state and federal claim. The Supreme Court in *Gasperini,* held that in diversity cases federal courts should apply the state standard, but the Court did not address whether federal courts should apply the state standard when determining whether a damages award pertaining to a pendent state law claim is excessive. 518 U.S. at 425–31, 116 S.Ct. 2211. District courts in this Circuit are split as to whether *Gasperini* requires application of the state standard to state pendent claims. *Compare Carter v. Rosenberg & Estis, P.C.,* No. 95–CV–10439, 1998 WL 150491, at *18 n. 12 (S.D.N.Y. Mar.31, 1998) (applying federal standard to state pendent claim); *Kim v. Dial Serv. Int'l, Inc.,* No. 96–CV–3327, 1997 WL 458783, *5 n. 2 (S.D.N.Y. Aug.11, 1997) (same) with *Bick v. City of New York,* No. 95–CIV–8781, 1998 WL 190283, at *20 (S.D.N.Y. Apr.21, 1998) (applying state standard to state pendent claims); *Shea v. Icelandair,* 925 F.Supp. 1014, 1020 (S.D.N.Y.1996) (same).

victed of rape, for which he is still imprisoned.[9] It is obviously disquieting to reflect upon the probable reality that the rape victim may not have sued for this intentional tort because of the pragmatic recognition that a judgment would undoubtedly be uncollectible, and the statute of limitations has long since run.[10] Nonetheless, the law draws no distinction between acquitted and convicted prisoners in regard to their right to have their jailers provide appropriate security since "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (internal quotation omitted). The State Legislature might, however, wish to consider whether legislation should be enacted tolling the running of the statute of limitations in these circumstances, to provide for a realistic window of opportunity for the victim to sue for damages. The so-called "Son of Sam" law, N.Y.Exec.L. § 632–a, does not appear to cover cases, such as the present one, where monies realized by a convicted felon are not derived from the fruits of the crime. *Id.* § 632–a(b); *see also* 18 U.S.C. § 3681 (federal "Son of Sam" law).

**9.** The Court allowed the jury to be told that Arnold was a convicted felon, *see* FRCP 609, but ruled that knowledge that the conviction was for rape would be prejudicial under FRCP 403.

**10.** The New York statute of limitations for intentional torts is one year. *See* CPLR § 215. The statute of limitations in New York for the federal Violence Against Women Act ("VAWA"), 42 U.S.C. § 13981(c), which pro-

## CONCLUSION

A revised judgment shall be entered for the plaintiff against the defendant County of Nassau in the sum of $725,000, together with interest from April 26, 1999, the date of the initial judgment. Interest shall be computed at the federal rate. *See* 28 U.S.C. § 1961; *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 55 (2d Cir.1998) (awarding interest at federal rate on judgment on federal and pendent state law claims); *see also Weitz Co. v. Mo–Kan Carpet, Inc.,* 723 F.2d 1382, 1386 (8th Cir. 1983) (in diversity action with judgment based on state law claims, awarding post-judgment interest at federal rate because "[n]o exemption is made [under 28 U.S.C. § 1361] for actions based on ·diversity of citizenship"). In addition, the parties shall enter into an annuity contract in regard to the $175,000 balance of the compensatory damage award, pursuant to CPLR § 5041. The Court shall retain jurisdiction in the unlikely event that the parties cannot agree upon such contract, or on the plaintiff's anticipated request for counsel fees under 42 U.S.C. § 1988 on the *Monell* claim.[11]

**SO ORDERED.**

vides a civil cause of action in favor of the victims of gender-motivated violent crimes, is three years. *See Ericson v. Syracuse Univ.,* 35 F.Supp.2d 326, 329–30 (S.D.N.Y.1999).

**11.** In respect to counsel fees, plaintiff should be mindful of the time constraints under FRCP 54(d)(2)(B). *See Weyant v. Okst,* 198 F.3d 311, 313–16 (2d Cir.1999).