**Steven W. ARNOLD, Plaintiff–Appellee,**

**v.**

**The COUNTY OF NASSAU and Nassau County Sheriff's Department, Defendants–Appellants,**

**John Jaronczyk, Thomas Serroen and Michael Feldon, Corrections Officers, Defendants.**

No. 00–7248.

United States Court of Appeals, Second Circuit.

Argued Oct. 12, 2000.

Decided June 06, 2001.

Paul F. Millus, Snitow & Cunningham (Robert P. Devlin, on the brief) New York, NY, for Defendants–Appellants.

Thomas A. Illmensee (Martin A. Schwartz, H. Raymond Fasano, on the brief) Garden City, NY, for Plaintiff–Appellee.

Before WALKER, Chief Judge, VAN GRAAFEILAND, Circuit Judge, and MARRERO,* District Judge.

PER CURIAM:

Defendants-appellants the County of Nassau and the Sheriff of Nassau County ("Nassau County") appeal from a judgment of the United States District Court for the Eastern District of New York (Frederic Block, *District Judge*) denying their motions for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) and for a new trial pursuant to Fed.R.Civ.P. 59(b). Although not explicitly argued by Nassau County, we construe Nassau County's ap-

---

* The Honorable Victor Marrero, of the United States District Court for the Southern District of New York, sitting by designation.

peal as a challenge to the district court's denial of its Rule 59(b) motion for a new trial.

## Background

On Thursday, July 23, 1992, Arnold was arrested by the Nassau County Police, charged with rape, and arraigned in Nassau County District Court. He was unable to post bail and was remanded to the Nassau County Correctional Center ("NCCC") as a pretrial detainee on July 24. Over the weekend, Arnold was the victim of at least one assault by other inmates. He subsequently brought this action against Nassau County, its Sheriff and individual corrections officers for failing to protect him from being assaulted and beaten by fellow inmates while being held in pretrial detention.

Upon his detention, Arnold was placed in protective custody pursuant to "Warden's Order: Sex Crimes," an order designed to assure that inmates charged with sex crimes are removed from the general prison population because they are at greater risk of assault by other inmates. Arnold declined the option of a 22–hour lockdown in his cell, which would have afforded him even more protection than protective custody. *See Arnold v. County of Nassau,* 89 F.Supp.2d 285, 289 (E.D.N.Y.2000). Arnold failed a suicide screening test, required by New York State law, and was therefore assigned to the mental observation ward. While sex offenders in the protective custody ward are segregated from the general inmate population, sex offenders in the mental observation ward are allowed to mix with other mental observation inmates, at least some of whom are from the general prison population.

The mental observation ward is adjacent to the protective custody ward, and each comprises two "tiers." These four tiers contain 20 cells, and each tier can house up to 25 inmates because five of the cells contain double bunks. Each tier is approximately 200 feet long. A common area exists in the center of each tier and inmates are allowed to congregate in the common area when they are not locked in their cells. *See Arnold,* 89 F.Supp.2d at 309 (diagram). The cells are unlocked and remain open from approximately 10 or 11 a.m. until 5 p.m., except during meal times.

A perimeter catwalk encircles the four tiers, and a security officer patrols the entire catwalk every four to fifteen minutes. *Arnold,* 89 F.Supp.2d at 290–91. Outside of each tier is a security post, located at the sole access point to each tier, in which one officer sits. There is an additional security post in the lobby entrance to the tier floor, in which two officers sit. In addition, prior to January 6, 1992, there was a "tier sitter" for each of the four tiers; the tier sitter observed the tier's inmates and patrolled the perimeter of that tier only. Effective January 6, to contain costs, the Sheriff reduced the number of tier sitters on the mental observation tiers from two to one.

Arnold allegedly was assaulted twice while in the mental observation ward of the NCCC. The timing of the assaults is sharply disputed by the parties and may have implications as to Nassau County's potential liability depending upon what time the beatings occurred; *e.g.,* how many corrections officers were on duty at a specific time. According to Arnold, the two assaults occurred on Saturday, July 25 (Arnold concedes, however, that he is not certain as to the date), the second shortly after the first, within no more than fifteen minutes. At some point after the second beating, Arnold was taken to the prison infirmary and then returned to his cell despite the fact that he was still bleeding from his left eye, mouth and nose. "Soon thereafter," according to Arnold, he was

taken to the hospital. *Arnold,* 89 F.Supp.2d at 291.

Nassau County, relying on medical and NCCC records, contends that the first assault occurred sometime in the early afternoon of Sunday, July 26, and that the second more severe beating occurred hours later. According to the prison infirmary's medical records, Arnold was first injured at about 2 p.m. on July 26, 1992, and his injuries consisted of a nosebleed and a contusion on his forehead, which were treated with pressure on the nose and an ice pack. Arnold suffered no loss of consciousness at this time. Medical records dated July 27 indicate that the second more severe attack occurred during the evening of July 26, hours after the first attack. A NCCC report also indicated that a corrections officer found Arnold in his cell during the morning of July 27 at which time Arnold was unresponsive, bleeding from the mouth and breathing shallowly as a result of the second beating. The report stated that Arnold was taken to the hospital that same morning where his injuries, which included fractures to facial bones and other trauma to the head and body, were treated. As a result of the injuries sustained from the assaults while in the NCCC, Arnold allegedly suffers long-term and possibly permanent nerve damage and cognitive impairment. *See Arnold,* 89 F.Supp.2d at 293–94.

Arnold sued three corrections officers individually for failure to reasonably protect him from foreseeable attacks by other prisoners; Nassau County and the Sheriff for negligence under New York Correction Law 500–b(7), which requires the Sheriff to safeguard all inmates, especially those who may be particularly susceptible to abuse; and Nassau County and the Sheriff for their alleged policy or practice of deliberate indifference to a substantial risk of inmate violence in a violation of Arnold's constitutional rights pursuant to 42 U.S.C.

§ 1983. The district court bifurcated the trial to first assess liability, then damages. On March 25, 1999, the jury found the individual corrections officers not negligent, but found against the County and the Sheriff on both claims. On April 26, 1999, the jury awarded Arnold present and future damages totaling $900,000; the district court subsequently entered a revised judgment reducing Arnold's award to $725,000. *See Arnold,* 89 F.Supp.2d at 308.

## Discussion

We review the denial of a motion for a new trial for abuse of discretion. *See Gasperini v. Center for Humanities, Inc.,* 149 F.3d 137, 141 (2d Cir.1998). A district court has not abused its discretion unless the decision to deny the 59(b) motion resulted from an erroneous view of the law or clearly erroneous findings of fact, or the district court's decision is arbitrary, unsupported by the facts, unfair, beyond the range of authority or otherwise manifests a clear error of judgment. *Id.* at 142.

We find that the failure of the district court to define for the jury crucial terms such as "housing area," and other similar terms such as "facility housing area," constitutes clear error warranting a new trial because, in all likelihood, the jury relied on these terms in determining the County's liability. And where, as is the case here, "a decision turns on the meaning of a word in a statute or regulation, the decision is one of law which must be made by the court." *Stissi v. Interstate and Ocean Transp. Co.,* 765 F.2d 370, 374 (2d Cir.1985) (citations omitted).

The definition of "housing area" was essential to the jury's ability to determine whether Nassau County acted negligently and/or was deliberately indifferent to Arnold's physical safety. This is because the applicable regulations, the New York State

Minimum Standards and Regulations for the Management of County Jails and Penitentiaries ("County Jail Minimum Standards"), which are relied on heavily by Arnold, specify the appropriate level of correctional officer supervision required within each "housing area" contained within the NCCC.

Moreover, "housing area" is a term used with considerable frequency in the County Jail Minimum Standards. Most relevant here, Section 7003 provides, in pertinent part, that "active supervision shall be maintained in all facility housing areas, including multiple occupancy housing units when prisoners are confined in such area but not secured in their individual housing units." 9 N.Y.C.R.R. § 7003.3(a). "Active supervision" is further defined under the regulations as:

the immediate availability to prisoners of facility staff responsible for the care and custody of such prisoners which shall include:

(1) uninterrupted ability to communicate orally with and respond to each prisoner unaided by any electronic or other artificial amplifying device; and

(2) the conducting of supervisory visits at 15–minute intervals;

(3) the ability of staff to immediately respond to emergency situations; and

(4) *in any facility housing area in which more than 20 inmates are housed, the continuous occupation of a security post within such housing area.*

9 N.Y.C.R.R. § 7003.2(c) (emphasis added).

We agree with Arnold's counsel, who in addressing the court, observed that the phrase "housing area" was the "crux of the lawsuit. . . . The phrase housing area is important because it's mentioned, these minimum standards [County Jail Minimum Standards], and the issue before the jury, Your Honor, is whether a tier with more than 20 prisoners is a housing area under the regulations." We note, as did the district court, the term "housing area" is not defined in the County Jail Minimum Standards or in other relevant regulations.

Based on our review of the record, it appears highly likely that the jury considered the County Jail Minimum Standards in reaching its conclusions that Nassau County and its Sheriff (1) acted negligently in failing to protect Arnold from inmate violence and (2) were deliberately indifferent to Arnold's physical welfare. By its own recounting of its instruction to the jury, the district court referred the jury to the County Jail Minimum Standards in regard to the negligence claim against the municipal defendants. *See Arnold,* 89 F.Supp.2d at 296 ("The court also instructed the jury that it may, but need not, consider the State's Minimum Standards and Regulations for Management of County Jails, in assessing whether [New York Corrections Law 500–b(7) ] had been violated."). The district court then proceeded to read to the jury the relevant sections of the County Jail Minimum Standards.

It is also probable that the jury considered the County Jail Minimum Standards in relation to the alleged constitutional tort. The district court, in denying defendant's motion for a new trial, reasoned that, "there was ample evidence of a practice of disregard for the Minimum Standards and Regulations for the Management of County Jails that the jury could add to the deliberate indifference mix." *Arnold,* 89 F.Supp.2d at 306. Yet, the district court failed to define "housing area," a term critical to the liability of Nassau County, as a matter of law. *Cf. Stissi,* 765 F.2d at 374. Later, the jury's confusion regarding the "housing area" was apparent when, during deliberations,

it repeatedly requested a definition of that term.

In view of the importance of the term "housing area" to the jury's determination, the district court's failure to define the term as a matter of law, and the jury's articulated confusion in regard to the term, we hold that the district court abused its discretion by failing to define "housing area." We therefore vacate the judgment and remand for a new trial.

Since the case will be retried, we think it might assist the district court upon retrial, and this court upon further review, to have the benefit of a few observations. This case is extremely fact intensive. Therefore, the district court may want to consider using a general verdict accompanied by answers to interrogatories pursuant to Fed.R.Civ.P. 49(b).

The district court may wish to consider asking the jury questions based on the following issues: (1) the date and time of each beating;[1] (2) the duration of the beatings, and, if applicable, whether the corrections officers responded in a timely manner; (3) the amount of time between the two beatings; (4) whether the designated number of tier sitters——one per two tiers—amounts to negligence pursuant to state law and/or a constitutional violation pursuant to 42 U.S.C. § 1983; and (5) whether the placement of Arnold, an alleged sex offender, in the mental observation tier amounts to negligence pursuant to state law and/or a constitutional violation pursuant to 42 U.S.C. § 1983.

In light of our disposition of this appeal, we need not reach appellants' remaining arguments.

*Conclusion*

For the foregoing reasons, the judgment of the district court is VACATED and the matter is REMANDED to the district court for a new trial.

---

1. If the answers to these questions is that the more severe beating did not occur at or around lunchtime of Sunday, July 26, then it would be appropriate for the district court to instruct the jury that it may not draw adverse inferences from the fact that, if proven, correctional officers may not have been at their posts during that time period.